## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | | |
|---|---|---|
| **INTELLIGENT VERIFICATION SYSTEMS, LLC,** | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Case No.  2:12-cv-525 |
| | } | **REDACTED VERSION** |
| **MICROSOFT CORP.,** *et al.,* | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Intelligent Verification Systems, LLC's ("IVS") Motion to Partially Exclude Opinions of Julie L. Davis, ECF No. 289, Motion in Limine to Preclude Any Reliance by Defendants on Microsoft's "Telemetry Data" or Related Alleged Summaries, ECF No. 397, Motion in Limine to Preclude Any Reliance by Defendants on Third Party Settlement Agreements and Related Materials, ECF No. 402, Motion in Limine (Omnibus Motion), ECF No. 404, Motion in Limine Regarding Prior Art, ECF No. 409, and Defendants Microsoft Corporation and Majesco Entertainment Company's (collectively "Defendants") Joint Motion to Exclude the Testimony of Walter Bratic, ECF No. 350, and Defendants' Joint Motions in Limine Numbers One through Ten, ECF No. 388.  On March 20, 2015, the Court conducted a hearing on all seven of these motions.  The Court will first consider the parties' *Daubert* motions and then address each motion in limine in turn.

### I. EXPERT OPINIONS

#### *A. Legal Standard*

Federal Rule of Evidence 702 permits admission of "scientific, technical or other

specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702 ("Rule 702"). The seminal case of *Daubert v. Merrell Dow Pharm., Inc.* provides that expert testimony may be admitted pursuant to Rule 702 if the testimony is both relevant and reliable, considering a number of factors including whether the theory or technique "can be (and has been tested)," whether it "has been subjected to peer review and publication," whether it has been "generally accept[ed]" in the "relevant scientific community," and "the known or potential rate of error." 509 U.S. 579, 589, 593-94 (1993). Although the admissibility of expert opinion is "flexible," the district court must function as a gatekeeper, permitting only expert testimony that comports with Rule 702's guidelines as explained in *Daubert*. 509 U.S. at 594. Moreover, the Court's gatekeeping responsibility applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

     Here, both parties' damages experts utilized ███████████████████████████

███████████████████████  ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**B.  The Proposed Expert Opinions**



---

[2] As explained by the parties in their briefing and confirmed at the hearing, haptic feedback is the technical term for vibration in a hand-held controller. One such example of haptic feedback occurs in a driving game when the player takes the vehicle "off-road." The hand-held controller will vibrate to signify departure from the paved road.





---

[3] "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license." *Georgia-Pacific Corp.*, 318 F. Supp. at 1120.



### C. Discussion

The parties' *Daubert* motions can be condensed to three categories: first, whether the Immersion/Sony verdict and license is more comparable than the Kinect-related settlement agreements; second, whether Mr. Bratic properly apportioned the royalty base; and third, whether Ms. Davis properly relied on telemetry data supplied by Defendants.

### *1. Comparability of the Licenses*

The Court considers together IVS's claim that Ms. Davis's reliance on the settlement agreements is improper and Defendants' argument that Mr. Bratic relied on non-comparable licenses including the Immersion/Sony verdict and thirteen Microsoft licenses.

In establishing a reasonably royalty, the "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit," *Lucent Techns., Inc.*, 580 F.3d at 1325, because "alleging a loose or vague comparability between different technologies or licenses does not suffice," *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). Although "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility," *Ericsson, Inc. v.*

*D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014), the Federal Circuit "ha[s] cautioned that district courts performing reasonable royalty calculations must exercise vigilance when considering past licenses to technologies *other* than the patent in suit and must account for differences in the technologies and economic circumstances of the contracting parties," *Virnetx, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (citations omitted). Indeed, the district court must exercise its gatekeeping function to bar non-comparable licenses when the license does not meet the baseline of comparability test, which considers whether "the methodology is sound" and whether "the evidence relied upon [is] sufficiently related to the case at hand." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) (discussing the "minimum threshold" for expert testimony)). If a license meets this baseline of comparability, the degree of comparability between licenses including "the degree of relevance or accuracy . . . may go to the testimony's weight." *Id.* ("The degree of comparability of the . . . license agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

Generally, settlement agreements proffered as comparable licenses are disfavored; however, in "limited circumstances" the Federal Circuit has sanctioned the use of a settlement agreement as a comparable license. In *ResQNet*, the Federal Circuit determined that a settlement agreement to the patents-in-suit was "the most reliable license in [the] record" when compared to other licenses which did not "even mention[] the patents in suit or show[] any other discernable link to the claimed technology." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010). In *ResQNet*, the expert relied on seven licenses, "five of which had no relation to the

claimed invention." *Id.* at 870. The remaining licenses both arose from litigation relating to the

patents-in-suit. *Id.* The Federal Circuit cited the expert and trial court's failure to explain the

link between the unrelated licenses and ultimately compared the licenses itself, finding that "[i]n

simple terms, the '075 patent deals with a method of communicating between host computers

and remote terminals–not training, marketing and customer support services. The re-bundling

licenses simply have no place in this case." *Id.* at 871. Thereafter, the Federal Circuit cited the

"limited scope of circumstances" outlined in *ResQNet* as occurring "where a lone settlement

agreement stood apart from all other licenses in the record as being uniquely relevant and

reliable." *LaserDynamics*, 694 F.3d at 77-78.

Here, IVS's attack on Ms. Davis's reliance on the settlement agreements, although

cloaked in other arguments including, *inter alia*, her alleged admission that the settlement

agreements were not relevant,[4] failure to investigate the agreements, and the potential prejudicial

effect of the settlement agreements, boils down to a claim that the license on which IVS relies —

the Immersion/Sony verdict and license—is more reliable than the settlement agreements. As

such, IVS claims that Defendants' settlement agreements do not fit within *ResQNet's* limited

circumstance of permitting settlement agreements only if they are the most reliable licenses on

the record. Applying *ResQNet* in its most narrow interpretation ultimately yields this conclusion:

settlement agreements are permissible as comparable licenses if they are the most reliable

licenses on the record. Indeed, both IVS and Defendants apparently agree with this

---

[4] As the undersigned noted at the hearing, IVS's interpretation of Ms. Davis's deposition regarding this point is stretched, at best, and misleading, at worst. In response to the question, ███████████████████████████ ██████████████████████████████████████████████████ IVS interpreted this statement as Ms. Davis "admit[ting] [the settlement agreements] have no effect on her ultimate number; thus they are not relevant." *Id.* Such a characterization of this section of the deposition is inaccurate as███████████ ████████████████████████. An interpretation that she was admitting that the settlement agreements were irrelevant misconstrues Ms. Davis's statements.

characterization of *ResQNet's* holding. *See* ECF No. 354 at 10 ("The Federal Circuit has permitted consideration of settlement agreements when they are the best available evidence, that is, the agreements most comparable to the case at hand."); ECF No. 370 at 11[5] ("Defendants fail to prove the four settlement agreements are more reliable than the licenses presented by IVS.").[6] Thus, whether Defendants' proposed Kinect-related settlement agreements may be relied upon as comparable licenses is based on a comparison to IVS's Immersion/Sony verdict. Only if the Kinect-related settlement agreements are more reliable licenses on the record can they be relied upon by Ms. Davis. Subsumed in that consideration, then, is an analysis of the comparability of the Immersion/Sony Verdict and whether it, or the settlement agreements, meet the baseline of comparability test.

To reiterate the baseline of comparability test, the Federal Circuit has held that the "degree of comparability" including its relevance and accuracy are factual questions for the jury, but the baseline of comparability, or the "minimum threshold," requires that "the evidence relied upon [be] sufficiently related to the case at hand." *ActiveVideo*, 694 F.3d at 1333 (quoting *i4i*, 598 F.3d at 852). For the following reasons, the Court finds that the Immersion/Sony verdict and license does not qualify as "sufficiently related" evidence, and the Kinect-related settlement agreements constitute the most reliable licenses on the record.

Preliminarily, at the hearing, the undersigned questioned both parties as to what evidence could meet the baseline of comparability test to permit an expert to opine about a comparable

---

[5] IVS also argued that the settlement agreement in *ResQNet* "was a license by the plaintiff in the case for the plaintiff's patent in suit," and "Defendants do not cite a single case that even considered the admissibility of a settlement agreement that did not involve the plaintiff in the case settling a case and licensing the patent in suit." *Id.* at 10-11. These claims, however, are all sub-arguments for the ultimate consideration of whether the agreements are the most reliable licenses.

[6] At the hearing, IVS relied extensively on *Apple, Inc. v. Samsung Elecs. Co.*, 11-cv-01846, 2013 WL 5958176 (N.D. Cal. Nov. 7, 2013). However, IVS relied on the holding of *Apple* without explaining how the nuances of that holding translate to this case. For example, "all experts in the *Apple* case determined that the litigation settlement in question was "not probative to their primary opinions." *See GPNE Corp. v. Apple, Inc.*, 12-cv-02885, 2014 WL 1494247, at *9 (N.D. Cal. Apr. 16, 2014) (citations omitted) (distinguishing *Apple* based on its facts).

license. IVS answered that once a technical expert opined as to the comparability of the technology, then the baseline test has been met; defendants argued that the technology must be related to the actual claimed invention. The undersigned finds IVS's test—that a technical expert's opinion on comparability is sufficient to establish a baseline of comparability—to be logically inconsistent with the Court's role of acting as a gatekeeper to bar non-comparable licenses. If a baseline of comparability could be established simply through a technical expert's opinion, then the Court's role in determining whether the "minimum threshold" had been met would be largely irrelevant, and would directly contravene the Federal Circuit's direction that "[w]hen relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. Under IVS's baseline rule, a "loose or vague comparability" would be sufficient, if indeed that comparison was spoken from the mouth of a technical expert. Defendants' baseline of comparability answer more closely mirrors the language of *ActiveVideo* and *i4i's* "minimum threshold" test that "the evidence relied upon [be] sufficiently related to the case at hand." *ActiveVideo*, 694 F.3d at 1333 (quoting *i4i*, 598 F.3d at 852).

IVS argued that the technology in the Immersion/Sony verdict and license is comparable to the patented technology because both enhance game play and relate to user interaction. However, Mr. Bratic's citation to Dr. Rhyne's technical comparison of the technology was much more cursory: ███████████████████████████████████████

███████████████████████████████████████████

Moreover, Dr. Rhyne's opinions cited in the pleadings were not more explanatory. IVS quoted Dr. Rhyne's "classifi[cation] of the Immersion patents as covering 'an input and output device;'" which according to IVS, rendered the '073 patents and the Immersion patents technically

comparable. ECF No. 371 at 4. IVS also argued that the proper focus for comparability should be on the patent disclosures themselves, as opposed to how the technology is practiced in the accused device. IVS argued, citing Dr. Rhyne, that because "the Immersion patents disclosed a man-machine *interface* which provides tactile feedback also known as haptic feedback[,] . . . [t]here was no requirement that the technology of the Immersion patents must be implemented in a traditional video game controller." *Id.* Thus, the patents were comparable because "[t]he '073 patent is not *required* to be implemented in a traditional video game controller and there is also no limitation that the '073 patent could not cover a video game controller as part of an interactive apparatus." *Id.* at 5.

Mr. Bratic's reliance on the Immersion/Sony verdict and license as a comparable license and IVS's arguments in support of comparability are flawed for at least three reasons.[7] First, IVS's attempt to shift focus away from how the Immersion patent was practiced as haptic feedback in the accused Sony game controllers, to simply the Immersion patent disclosure, is misplaced. Although the patent disclosure does have some role to play in the comparability analysis, it is not a role that can swallow the license agreement entirely. IVS's attempt to dodge flaws in how the Immersion technology was implemented as haptic feedback by focusing on the patent disclosures is not sufficient to establish comparability. IVS's consideration of the Immersion patent disclosures are theoretical in nature; arguably, the Immersion patents, and even the '073 patent, need not be practiced entirely in the way they are in the accused products. But ignoring the patent's practice in the accused product, by hiding behind the language of the patent disclosures, ignores the role that the technological comparison plays within the license comparability analysis. The technological considerations are subsumed with in the ultimate

---

[7] The Court also notes that the Immersion/Sony verdict and royalty rate was set years before the Federal Circuit began requiring apportionment of damages, a fact which Mr. Bratic readily admitted. ECF No. 355, attach. 2 at 17.

consideration of the *license* comparability; so, the correct focus is on how the patented technology is practiced within the license. Moreover, IVS cited no case law supporting the proposition that a patent's disclosures could override the comparison between how the technology is practiced in considering license comparability.

Second, the Immersion/Sony technology is far from comparable to the patented technology. IVS's patented technology primarily functions as an input device, using facial recognition technology to acquire information about the player. Conversely, the Immersion/Sony technology primarily functioned as an output device, using haptic feedback to signal the player as to game play changes. Even more importantly, the Immersion/Sony technology was simply a modification of a handheld game controller, whereas the IVS's patented technology of facial recognition displaces the need for handheld game controllers, resulting in a fundamental change in game play. IVS's argument that both technologies relate generally to an "interface" is reminiscent of the Federal Circuit's rejection of a license simply because it was "PC-related." *Lucent*, 580 F.3d at 1328. Finally, regardless the technologies' comparison, Mr. Bratic's use of the Immersion/Sony verdict and license as a comparable license belies his proposition that the two are comparable. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███ The fact that Mr. Bratic had to modify the royalty rate, based on the consideration that the Immersion/Sony technology was *less* valuable than the patented technology, is considerable evidence of the non-comparability of the Immersion/Sony technology.[8]

---

[8] IVS argued that Defendants' failure to move to exclude Dr. Rhyne's opinion as to the comparability of the licenses is fatal to their attack on Mr. Bratic. The Court finds this argument unpersuasive. In considering the comparability

Not only was Mr. Bratic's reliance on the Immersion/Sony verdict and license as a comparable license improper, Mr. Bratic also incorrectly relied on thirteen Microsoft licenses to support the form of his royalty under *Georgia-Pacific* Factor No. Two. ECF No. 322, attach. 10 at 36. Mr. Bratic admitted that none of these agreements involved comparable technology, but proffered them simply to support his finding that the hypothetical negotiation would produce a running royalty, as opposed to a lump sum payment. *Id.* The Northern District of California recently rejected a similar opinion in *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006 (N.D. Cal. Mar. 11, 2013). There, the expert cited agreements that were "not for technologies directly comparable" to prove that "Sony has agreed to pay running royalties ranging from $0.01 to $0.25 per unit." *Id.* at 1015. Because the expert admitted that the technologies were not comparable, the court excluded him from referencing them, even though he proposed to only use them to note that they supported his royalty rate. *Id.* Mr. Bratic attempts to do the same thing as the expert in *TV Interactive Data Corp.* He admits the technologies are not comparable, even though Factor No. Two is addressed to "[t]he rates paid by the licensee for the use of other patents *comparable* to the patent-in-suit." ECF No. 322, attach. 10 at 36. Though Mr. Bratic proposes to use the licenses simply to support the form of the royalty, the Federal Circuit has specifically rejected reliance on technologically non-comparable licenses under *Georgia-Pacific* Factor. No. Two. *See, e.g.*, *Lucent*, 580 F.3d at 1326-28.

Notably, IVS never argued on brief or at the hearing that the Kinect-related settlement agreements were not technologically comparable. IVS's remaining disputes with the Kinect-related settlement agreements about the inclusion litigation avoidance costs in the agreements

of the licenses, the Court has addressed Mr. Bratic's analysis and his reliance on Dr. Rhyne. Excluding any reference to the Immersion/Sony verdict and license will bar both experts from discussing it.

14

and Ms. Davis's alleged failure to investigate the agreements will be subjects for cross-examination.[9]  Accordingly, the Kinect-related settlement agreements are the most reliable licenses on the record.  In addition, the Court's rejection of Mr. Bratic's reliance on the Immersion/Sony verdict and license renders Defendants' remaining challenge pertaining to Mr. Bratic's multiplication of the Immersion/Sony license rate by three moot.

*2. Mr. Bratic's Apportionment Analysis*

Besides Mr. Bratic's reliance on the Immersion/Sony verdict and license as a comparable license, the parties also dispute Mr. Bratic's apportionment.[10]  As discussed above, Mr. Bratic determined what hardware components of the accused products were necessary to practice the patent, identifying this as the SSPPU.  Then, he determined the cost of those necessary components as compared to the total cost of the accused product to determine what percentage of the total cost of the accused product was attributable to the SSPPU.  Mr. Bratic applied that percentage to the average sales price of the accused product to create an apportioned royalty base.  Mr. Bratic opined that ████████████████████████████████████
████████████████████████████████████████

"By statute, reasonable royalty damages are deemed the minimum amount of infringement damages 'adequate to compensate for the infringement.'"  *LaserDynamics*, 694 F.3d at 66 (citing 35 U.S.C. § 284).  To properly calculate this compensation, "it is generally required that royalties be based not on the entire product, but instead on the smallest salable patent-practicing unit." *Id.* at 67 (citations omitted).  This is because "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire

---

[9] In its *Daubert* motion, IVS also moved to exclude the settlement agreements "as unduly prejudicial under Federal Rule of Evidence 403 and subject to exclusion under Federal Rule of Evidence 408." ECF No. 316 at 9.  Such arguments are properly reserved for a motion in limine, and will be addressed accordingly.
[10] Because Ms. Davis determined that a lump sum payment was a reasonable royalty, she had no need to apportion.

product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *Id.* The "Entire Market Value Rule" or "EMVR" is a "narrow exception" to the general rule requiring royalties be derived from the SSPPU. *Id.* The EMVR provides that "a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product," only "[i]f it can be shown that the patented feature drives the demand for an entire multi-component product." *Id.*

Both parties agree that this case does not qualify for the EMVR exception;[11] indeed, IVS has not asserted that its facial recognition technology drives demand for the Xbox 360 or the Xbox One. The parties' dispute hinges on whether Mr. Bratic properly apportioned the royalty base, specifically, whether he was required to apportion beyond identifying the SSPPU. Defendants argued that Mr. Bratic was required to apportion out the value attributable to the patented features, beyond just his identification of the SSPPU. IVS's response is four-fold: first, IVS argued that because the patent-in-suit is an apparatus claim, the entirety of the accused products are necessary to infringe and constitute the SSPPU, *see* ECF No. 371 at 17 ("The Xbox console, the Kinect, and the games are not broken down into smaller component parts that in turn are sold on the market. Thus, the accused products, taken together, form the 'smallest saleable unit' and 'smallest saleable patent practicing unit);'" second, that further apportionment for the value of the patented feature, beyond removing the non-infringing hardware components, was not required, *id.* at 20-21; third, at the hearing, IVS argued that once apportioned, the royalty rate

---

[11] Defendants also argued that Mr. Bratic improperly relied on the entire sales of the accused product. Because IVS has admitted that it does not qualify for the EMVR exception, the Court finds no reason to permit Mr. Bratic to testify to the entire sales of the accused product. Indeed, to opine as to the entire sales under the guise of apportioning circumvents the EMVR entirely. The Federal Circuit has strongly cautioned against disclosure of an alleged infringer's total sales or revenue because of the potential to skew the jury's damages calculation. *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1320 (Fed. Cir. 2011) ("The $19 billion cat was never put back into the bag even by Microsoft's cross-examination of Mr. Gemini and re-direct of Mr. Napper, and in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case.") (citations omitted).

itself accounts for the value of the patented features; and finally, that Mr. Bratic was prevented from apportioning the value of the patented feature because Defendants failed to provide adequate usage data.

Notably, IVS's argument on brief that the SSPPU is the entire accused product, *id.* at 17, is directly contrary to Mr. Bratic's opinion. Mr. Bratic opined:



Mr. Bratic went on to identify the necessary hardware components needed to practice the patented feature and identified those necessary components as the SSPPU. *Id.* Moreover, at the hearing, IVS stated that of the eighteen components listed in the bill of materials for the accused products, only eight were identified by as being necessary to practice the patented feature. Accordingly, the undersigned disregards IVS's argument that the SSPPU is the entirety of the accused product as Mr. Bratic did not opine in that regard; rather, the SSPPU identified by Mr. Bratic was only those hardware components necessary to practice the patented feature.

Second, IVS argued that further apportionment for the value of the patented feature, beyond identification of the necessary hardware components, was not required. Although IVS cited large portions of the Federal Circuit's holding in *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014) in its brief, IVS's attempt to distinguish *Virnetx* is not readily apparent. IVS seems to distinguish *Virnetx* on its facts, arguing that "[i]n *Virnetx*, the patents in suit had system and method claims that did not recite component hardware parts like the entertainment device, acquisition device, and processor." ECF No. 371 at 19. IVS also argued that "further

apportionment beyond removal of the 'non-infringing components' from the accused products is not a requirement imposed by *Virnetx* or any other legal authority cited by Defendants." *Id.* at 21. However, these arguments fail to rebut the plain language of *Virnetx*:

> Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology.  To hold otherwise would permit the entire market value exception to swallow the rule of apportionment.

767 F.3d at 1327-28. Although Mr. Bratic did apportion out those hardware components not required to practice the patented feature, he did not properly apportion any value to the necessary hardware components.  Indeed, a processor has "several non-infringing features with no relation to the patented feature," *id.* at 1327, yet Mr. Bratic attributed 100% of the processor to the apportioned royalty base. IVS could not plausibly argue that the processor[12] does not have any other function besides practicing the patented feature, but that is exactly what Mr. Bratic's apportionment signifies.   His failure to identify the value of those necessary hardware components renders his opinion flawed and directly contrary to the Federal Circuit's provision in *Virnetx*.   Moreover, Mr. Bratic's value determination based on comparing the costs of the necessary hardware components to practice the patented technology and the total cost of the accused product also fails to properly consider the value of the patented feature.  This calculation still ties the alleged "value" to the necessary hardware components, not the value of the patented feature.  Under *Virnetx*, Mr. Bratic was barred from ascribing all of the value of the patented feature to a multi-component product like a processor.

Further, IVS argued at the hearing that, once apportioned, the royalty rate itself accounts

---

[12] A processor, also called a "CPU" or Central Processing Unit "is the brains of the computer where most calculations take place.  In terms of computing power, the CPU is the most important element of a computer system." Vangie Beal, CPU-Central Processing Unit, www.webopedia.com/TERM/C/CPU.html (last visited Mar. 24, 2015).

for the value of the patented feature. Although IVS cited *Virnetx* for this proposition, *Virnetx's* consideration of an expert's royalty rate was in the context of whether his reliance on comparable licenses was proper. *Id.* at 1330-1331. Indeed, the opposite conclusion appears to be correct. *Id.* at 1333 ("[A] patentee may not balance out an unreasonably high royalty base simply by asserting a low enough royalty rate.") (citing *Uniloc,* 632 F.3d at 1320). Moreover, Mr. Bratic did not use the royalty rate to account for the value of the patented feature within the accused product. Mr. Bratic increased his royalty rate based on an assumption that the patented technology was more valuable than the Immersion patents. Thus, any consideration of the value of the patented technology in the royalty rate was a comparison between the Immersion technology and IVS's '073 patent, not the value of the patented feature, facial recognition, to the accused product, Kinect and Xbox 360 or Xbox One.

Finally, IVS's argument that Mr. Bratic failed to apportion the value of the patented feature because Defendants did not provide adequate usage data is meritless. Regardless of whether Defendants provided usage data, it was IVS's burden to apportion the value of the patented feature to substantiate its damages claim. *See e.g., VirnetX,* 767 F.3d at 1329 ("VirnetX cannot simply hide behind Apple's sales model to avoid the task of apportionment."); *LaserDynamics,* 694 F.3d at 70 (holding that there is no "necessity-based exception to the entire market value rule"). Moreover, Mr. Bratic did not cite any lack of usage data in his analysis; rather, his "value" apportionment was based on the cost of the necessary hardware components as compared to the total cost of the accused product. Accordingly, the undersigned finds that Mr. Bratic improperly apportioned the royalty base by failing to apportion the value of the patented feature beyond his identification of the SSPPU.

*3. Ms. Davis's Reliance on Telemetry Data & Other Methodological Attacks*

IVS claimed that Ms. Davis's reliance on telemetry data provided by Defendants was improper because "she never looked at the actual underlying data upon which these litigation-inspired spreadsheets are allegedly based and never asked to see that data." ECF No. 315 at 17. Defendants' explanation of the telemetry data renders IVS's argument on this point moot.  At the hearing, Defendants explained that the telemetry data, or usage data, is ████████████████

████████████████████████████████████████████████████████████

████████████████████████████ ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ To review the "actual underlying data," as IVS asserted, Ms. Davis would have needed specialized training to sift through the vast amount of data collected by Microsoft. Such a duty need not be imposed on a damages expert.  Ms. Davis properly relied on the spreadsheets, which according to Microsoft, were generated directly from the underlying data. Any fault with Ms. Davis's calculation regarding the telemetry data and inclusion of games that were not accused are properly the subject for cross-examination as those issues go to the weight of Ms. Davis's testimony, not the admissibility.

IVS also argued that Ms. Davis did not quantify how she arrived at her lump sum payment ████████████, arguing that "she has not provided any mathematical basis for her conclusion, did not perform any mathematical calculations to arrive at it, and she had no starting point." ECF No. 316 at 19. "[A]ny reasonable royalty analysis necessarily involves an element of approximation and uncertainty," *Lucent*, 580 F.3d at 1325 (citations omitted), and IVS's

20

reliance on *Whitserve, LLC v. Computer Packages, Inc.* does not require otherwise. In *Whitserve*, the Federal Circuit stated that "while mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed." 694 F.3d 10, 31 (Fed. Cir. 2012). Ms. Davis's opinion was well within the "explanation" contemplated by *Whitserve*; for example, in considering Factor No. Fifteen, Ms. Davis cited eight different considerations ultimately necessary to forming her opinion. Moreover, Ms. Davis's lump sum amount was well within the range of comparable licenses provided to her and the cost of the design-around. IVS's other arguments that Ms. Davis ignored evidence about deficiencies with the design-around again can be discussed on cross-examination as this addresses the weight of her opinion, not its admissibility.

IVS's final complaint with Ms. Davis is her failure to consider "hold-up value." Hold-up value "deals[s] with the special situation in which a technical standard is set for an industry that puts one patent holder 'in a position to "hold up" the industry participants from implementing the standard.'" *Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 500-501 (S.D.N.Y. 2013) (citations omitted). IVS's argument as to this point appears contradictory. On brief, IVS argued that "hold up value is not relevant to this case . . . [and] Ms. Davis must be precluded from offering her opinions regarding hold up value." ECF No. 316 at 23. IVS further noted that Ms. Davis had testified that ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████ At the hearing, moreover, IVS argued that Ms. Davis *should* have considered "hold up value" and claimed that Ms. Davis should be barred from testifying that it is irrelevant. As IVS has admitted that its patented technology is not a technical standard, ECF NO. 316 at 23, the Court sees no flaw in Ms. Davis's opinion that hold-up value is

21

irrelevant. Moreover, any question as to a general negotiating advantage IVS would have had over Defendants due to the timing of the hypothetical negotiation centers on whether the negotiation would have been set in November or June 2010. Although Mr. Bratic opined that the hypothetical negotiation would have occurred in November 2010, the date of the first sale of the accused product, Ms. Davis opined that the negotiation would have occurred in June 2010, the date of first infringement when the Kinect was demonstrated for the public. IVS did not provide any evidence as to why the June 2010 date was incorrect. Accordingly, any argument that IVS had a negotiating advantage over Defendants due to the upcoming holiday season necessarily requires that the date of first infringement be set in November. As IVS has provided no evidence to contradict Ms. Davis's June 2010 date, IVS's argument as to its alleged negotiating advantage appears largely irrelevant.

In conclusion, for the reasons stated herein, Defendants' Motion to Exclude the Testimony of Walter Bratic, ECF No. 350, is **GRANTED** and IVS's Motion to Partially Exclude the Opinions of Julie L. Davis, ECF No. 289, is **DENIED**. The Court turns next to the parties' Motions in Limine.

## II. MOTIONS IN LIMINE

The Motions in Limine include: IVS's Motion in Limine to Preclude Any Reliance by Defendants on Microsoft's "Telemetry Data" or Related Alleged Summaries, ECF No. 397, IVS's Motion in Limine to Preclude Any Reliance by Defendants on Third Party Settlement Agreements and Related Materials, ECF No. 402, IVS's Motion in Limine (Omnibus Motion), ECF No. 404, IVS's Motion in Limine Regarding Prior Art, ECF No. 409, and Defendants' Joint Motions in Limine Numbers 1 through 10, ECF No. 388.

### A. Legal Standard

Although not specifically provided for in the Federal Rules of Evidence, motions in limine "ha[ve] evolved under the federal courts' inherent authority to manage trials." *United States v. Verges*, No. 1:13cr222, 2014 WL 559573, at *2 (E.D. Va. Feb. 12, 2014) "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Id.* However, a motion in limine "should be granted only when the evidence is clearly inadmissible on all potential grounds." *Id.* at *3. For the following motions in limine that are denied as premature, including challenges to relevance or authentication, they may be raised again through objections at trial. *See, e.g., Columbia Gas Transmission, LLC v. Martin*, No. 3:11-cv-060, 2011 WL 9974802, at *1 (E.D. Va. Dec. 19, 2011).

### B. Discussion

*1. IVS's Motion in Limine to Preclude Any Reliance by Defendants on Microsoft's "Telemetry Data" or Related Summaries*

IVS moved to exclude the telemetry data and other summaries on two grounds: first, as a sanction under Federal Rule of Civil Procedure 37(c) for Defendants' failure to timely disclose them in discovery; and second, because the spreadsheets are allegedly unauthenticated, inadmissible hearsay. IVS argued that, on four separate occasions, IVS requested the telemetry data either in a Request for Document Production ("RFP") or correspondence. However, it was not until IVS's Fifth RFP that IVS specifically referenced the request as "telemetry data." At the hearing, IVS represented to the Court that telemetry data would have been responsive to the Second RFP, September 2013 letter, and Fifth RFP.[13] Based on this case's lengthy factual history replete with motions to compel, the Court finds it perplexing indeed that if those three

---

[13] Counsel conceded that the First RFP cited in IVS's brief was not targeting telemetry data.

requests were directed at telemetry data, IVS would have declined to file a motion to compel on such arguably relevant evidence. Regardless of this consideration, however, Microsoft did timely produce spreadsheets of the telemetry data on September 18, 2014, one month after the Fifth RFP's specific request.

IVS also attacks the admissibility of the spreadsheets arguing that they were not produced in the ordinary course of business and are unauthenticated. As previously described by Microsoft's counsel at the hearing, this data was kept in the regular course of business, but the unwieldy nature of the data requires specific extraction. In their briefing and at the hearing, Microsoft extended IVS the opportunity to inspect the data in its raw form. Moreover, IVS's attack on the authentication of the data is ill-suited to a motion in limine. Defendants will proffer a foundation at trial, then if that is inadequate, IVS may object. Moving to exclude without any knowledge of the proffered foundation, however, is premature. Accordingly, IVS's Motion in Limine, ECF No. 397, is **DENIED.**

*2. IVS's Motion in Limine to Preclude Any Reliance by Defendants on Third Party Settlement Agreements and Related Materials*

IVS argued that the settlement agreements and related materials should be excluded pursuant to Federal Rule of Evidence 403 and 408, as inadmissible hearsay, and based on Defendants' inability to authenticate the agreements. As this Court already concluded that the settlement agreements constitute the most reliable, and therefore probative, evidence on the record, any prejudicial effect of the settlement agreements is greatly outweighed by their probative value. Moreover, Defendants' ability to lay a proper foundation is a question to be addressed after Defendants attempt to authenticate the agreements. Any question as to authentication is purely speculative at this stage in the litigation. Finally, to the extent that IVS contends the settlement agreements themselves are hearsay evidence, IVS does not contend that

Ms. Davis's reliance on the settlement agreements is improper as experts routinely on inadmissible evidence. Rather, IVS attempts to block the settlement agreements admission as evidence. However, whether the settlement agreements constitute hearsay will depend on their proffered purpose and factual context. Indeed, it is for this reason that "[o]rders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975). Accordingly, IVS's Motion in Limine, ECF No. 402, is **DENIED**.

*3. IVS's Omnibus Motion in Limine*

The parties represented that IVS's Motion in Limine Nos. One through Six, and Thirteen have been resolved by the parties; accordingly, with respect to these claims, the Court finds that they are **MOOT**.[14] Thus, the Court will only address the remaining disputed claims. For the following reasons, IVS's Omnibus Motion in Limine, ECF No. 404, is **DENIED**.

A. IVS's Motion in Limine No. Seven

IVS seeks to exclude any argument or evidence regarding an opinion of counsel. In response, Defendants proposed that they would consent to this request if IVS agreed not to argue that Defendants *should* have sought an opinion of counsel. IVS declined to stipulate to this agreement. At the hearing, Defendants represented that they do not intend to offer any evidence or argument regarding an opinion of counsel; thus, it is unclear as to what evidence IVS is attempting to exclude in this motion in limine. Accordingly, IVS's Motion in Limine No. Seven is DENIED.

B. IVS's Motions in Limine No. Eight

IVS's Motion in Limine No. Eight seeks to exclude the defenses of unpatentability and

---

[14] Additionally, Nos. One through Six, and Thirteen are included in the parties' stipulation. ECF No. 474.

prosecution history estoppel because Defendants did not provide any facts in discovery that would support these defenses. This motion "attack[s] the propriety of allowing Defendant[s] to proceed with several affirmative defenses, based upon the evidence produced – or not produce – during discovery." *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 2367740, at *1 (N.D. Ill. Oct. 15, 2004). Accordingly, "[b]ecause a motion in limine is not the appropriate vehicle for addressing the strength of the evidence or the substance of a complaint," *id.*, IVS's Motion in Limine No. Eight is DENIED.

C. IVS's Motions in Limine Nos. Nine and Eleven

IVS's Motion in Limine No. Nine seeks to exclude any argument, evidence or reference to Defendants' corporate citizenship, charitable acts, and similar matters. IVS's Motion in Limine No. Eleven seeks to exclude all evidence relating to Kinect for Windows or any other non-accused products. A motion in limine should only be granted when the evidence is undoubtedly inadmissible on all potential grounds. *Verges*, 2014 WL 559573, at * (citing *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)). At this stage, not having been presented with the factual context for which these arguments and evidence may be proffered, the Court cannot sanction such a broad exclusion. Accordingly, IVS's Motions in Limine No. Nine and Eleven are DENIED.

D. IVS's Motion in Limine No. Ten

IVS seeks to preclude the Defendants from using the existence of their own patents as any form of non-infringement defense. Defendants argue that to the extent their patents are permitted by law, such as evidence relating to willful infringement, the patents should be admitted. Moreover, Defendants argue that the patents are relevant to the development process of the accused products and relevant to their damages defense. A defendant's patents are

relevant to rebut a claim of willful infringement, *see King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed. Cir. 1985), and any relevance to the development process and damages defense will be determined based on the Defendants' factual context and proffered purpose of the evidence at trial. Accordingly, IVS's Motion in Limine No. Ten is DENIED.

## E. IVS's Motion in Limine No. Twelve

IVS seeks to preclude testimony about the functioning of the accused source code by witnesses on Microsoft's witness list and preclude expert testimony by Defendants' lay witnesses. Any scope of witness testimony is necessarily governed by the foundation laid by the party proffering the testimony. Accordingly, this motion is premature because it necessarily depends on whether Defendants lay an appropriate foundation and demonstrate relevance. Accordingly, IVS's Motion in Limine No. Twelve is DENIED.

## F. IVS's Motion in Limine No. Fourteen

IVS seeks to exclude mischaracterizations of IVS's infringement theories. The Court will define IVS's claims for trial and what arguments are appropriate and relevant to proving or disproving those claims. Accordingly, IVS's Motion in Limine No. Fourteen is DENIED as unnecessary.

## G. IVS's Motion in Limine No. Fifteen

IVS seeks to exclude improper non-infringement theories and arguments based on facial recognition not being required or necessary and based on limited time periods of non-infringement. At the hearing, Defendants represented that this motion essentially seeks to exclude Defendants' theory of their defense. Indeed, whether or not facial recognition is required or necessary for skeletal tracking may, at least, be a relevant consideration depending on the factual context in which the argument is proffered. At this juncture, the Court cannot say that

this argument is completely irrelevant not yet having considered IVS's arguments for infringement. Accordingly, IVS's Motion in Limine No. Fifteen is DENIED.

*4. Defendants' Motions in Limine Nos. One through Ten*

At the hearing, the parties represented that Defendants' Motions in Limine Nos. Six through Seven have been resolved. Moreover, per the filing of the Stipulation, ECF No. 474 at 2, the Court considers Defendants' Motion in Limine No. Eight and Nine resolved. Accordingly, the Court considers Nos. Six, Seven, Eight and Nine to be **MOOT**. Thus, the Court will only address the remaining disputed motions. For the following reasons, Defendants' Motion in Limine, ECF No. 388, is **GRANTED IN PART** and **DENIED IN PART**.

A. Defendants' Motion in Limine No. One

By this motion, Defendants seek to preclude IVS from making any reference and offering at trial evidence stemming from Immersion/Sony litigation. As outlined above, this Court has ruled that Mr. Bratic's reliance on this litigation was flawed under *Daubert*; accordingly, Defendants' Motion No. One is GRANTED.

B. Defendants' Motion in Limine No. Two

Here, Defendants seek to preclude IVS from referencing other non-comparable licenses, specifically in the context of opining as to the propriety of utilizing a running royalty as an appropriate damages benchmark. Mr. Bratic relied on thirteen Microsoft licenses involving non-comparable technology to support his opinion that the form of a running royalty was appropriate here. Again, the Court previously determined that Mr. Bratic's reliance on these non-comparable licenses was flawed; thus, for the reasons stated herein, Defendants' Motion No. Two is GRANTED.

## C.  Defendants' Motions in Limine Nos. Three and Four,

Defendants Motion in Limine No. Three seeks to preclude IVS from referencing the sales volume of Defendants' accused products.  Defendants' Motion in Limine No. Four seeks to preclude any reference to Microsoft's valuation, revenues, profitability, and cash reserves.  As this Court previously determined above, IVS does not qualify for the EMVR exception, and thus is barred from relying on the total revenue or sales of Defendants' accused products. Accordingly, Defendants' Motions in Limine Nos. Three and Four are GRANTED.

## D.  Defendants' Motions in Limine Nos. Five and Ten

Motion in Limine No. Five seeks to preclude any reference to unrelated legal proceedings involving the Defendants.  Defendants' Motion in Limine No. Ten seeks to preclude any mention of expert's prior retention by counsel in this case. "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *Verges*, No. 2014 WL 559573, at *2.  Such motions are disfavored, and should only be granted when the evidence is clearly inadmissible on all potential grounds. *Id.; Hawthorne Partners v. AT&T Techs., Inc.*, 831 F.Supp. 1398 (N.D. Ill. 1993).  Often, whether evidence should be admissible will depend upon the factual context in which it is placed.  Accordingly, "[o]rders in limine which exclude broad categories of evidence should rarely be employed.  A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg*, 519 F.2d at 712.

At this juncture, the Court cannot say that all evidence regarding the Defendants' other legal proceedings is irrelevant and therefore should not be admitted.  Moreover, neither can any evidence relating to an expert's prior retention by counsel be definitely excluded as irrelevant. Certainly, such information cannot be admitted without the appropriate foundation and

29

demonstration of relevance. However, absent the factual context in which such evidence might be proffered, an order excluding all such evidence before trial is premature. Consequently, Defendants' Motion in Limine Nos. Five and Ten are DENIED, and the Court will rule on these issues as they arise at trial.

*5. IVS's Motion in Limine Regarding Prior Art*

IVS seeks to preclude any evidence relating to Nitta 1997 because it is allegedly not prior art under 35 U.S.C. §§ 102 or 103; preclude any evidence or testimony regarding work in Japan because any relevance is outweighed by a high likelihood of confusion and possible prejudice; preclude any prior art references that were not part of an expert report and require expert testimony; and preclude any prior art not timely disclosed in discovery. For the following reasons, IVS's Motion in Limine, ECF No. 409, is **DENIED**.

IVS argues that Nitta 1997, a prior art publication relied upon by Defendants, is not prior art under 35 U.S.C. §§ 102(a), (b), and 103 because only patents and printed publications from foreign countries may qualify as prior art. "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *In re Hall*, 781 F.2d 897, 898-99 (Fed. Cir. 1986)). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Id.* (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)). According to IVS, Dr. Nitta, one of the authors of Nitta 1997, did not provide adequate evidence that Nitta 1997 had been publicly accessible such

that it could qualify as prior art. However, Dr. Nitta testified that he presented Nitta 1997 at a workshop in Nagoya, Japan in 1997. ECF No. 413 at 6. He testified that based on his understanding, he believed that everyone registered for his workshop, about fifty participants, received a copy of his paper. *Id.* He based this conclusion on the fact that he received a paper as a printed copy of the paper was distributed to all participants at the workshop. *Id.* at 7. Based on Dr. Nitta's testimony, Defendants have established enough evidence to prove that Nitta 1997 was publicly accessible such that it qualifies as prior art.[15] Moreover, any evidence or testimony by Drs. Nitta and Hasegawa regarding Nitta 1997 and other prior art references will most likely be relevant to providing context for the prior art. Accordingly, with regard to Nitta 1997 and Drs. Hasegawa and Nitta's testimony and evidence, the motion is DENIED.

IVS also seeks to exclude prior art references which were not part of an expert report and require expert testimony. IVS does not rely on any specific law for the proposition that prior art requires expert testimony, but generally relies on the principle that certain prior art references are highly technical and scientific in nature and may require expert testimony. Without presentation of those prior art references and the proffered testimony to explain them, the Court cannot implement such a broad exclusion as requested by IVS. Accordingly, with respect to prior art references not included in the expert reports and allegedly requiring expert testimony, this motion is premature, and the Court DENIES it.

Finally, IVS seeks to exclude prior art references not disclosed in discovery. At the hearing, Defendants represented that all the prior art references cited in their 35 U.S.C. § 282 Notice were disclosed in discovery, specifically in response to IVS Interrogatory No. 6. Accordingly, this motion is DENIED with respect to prior art references allegedly not disclosed

---

[15] It is curious that, although Nitta 1997 was repeatedly cited and relied upon by Microsoft in its summary judgment motion, only now does IVS raise the claim that Nitta 1997 is not prior art. *See* ECF No. 257.

in discovery.

## III. CONCLUSION

In summary, for the reasons stated herein, Defendants' Motion to Exclude the Testimony of Walter Bratic, ECF No. 350, is **GRANTED**, and IVS's Motion to Partially Exclude the Opinions of Julie L. Davis, ECF No. 289, is **DENIED**. IVS's Motion in Limine, ECF No. 397, is **DENIED**. IVS's Motion in Limine, ECF No. 402, is **DENIED**. IVS's Omnibus Motion in Limine, ECF No. 404, is **DENIED**. Defendants' Motion in Limine, ECF No. 388, is **GRANTED IN PART** and **DENIED IN PART**. IVS's Motion in Limine, ECF No. 409, is **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion and Order to all counsel of record.

It is so **ORDERED**.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
March 24, 2015